DOMINICK DEPALMA, etc.,

    Plaintiffs,

v.

THE SCOTTS COMPANY, LLC,

    Defendant.

Civ. No. 13-7740 (KM) (JAD)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

Now before this Court are motions for summary judgment by both sides in this FLSA collective action. Defendant The Scotts Company, LLC ("Scotts") seeks an order that the administrative exemption from FLSA coverage applies to the plaintiff sales managers. Plaintiffs seek an order that the executive and administrative exemptions do not apply to the plaintiff sales managers. For the reasons explained herein, I will deny both parties' motions for summary judgment on the FLSA employee-exemption issues. Scotts also seeks a ruling that the FWW methodology is appropriate for the calculation of damages. That portion of its motion, considered as a motion in limine, is granted.

I.     **Background[1]**

       a. **Facts**

       Scotts has proffered a statement of some 1500 material facts, some of them many paragraphs or even pages long. (DSOF (asserting 776 alleged material facts); DR, pp. 98–270 (asserting 766 additional, allegedly material

---

[1]     For ease of reference, certain key items from the record will be abbreviated as follows:

| | | | |
|---|---|---|---|
| "PSOF" | = | Plaintiffs' Statement of Undisputed Material Facts | [DE 179] |
| "DR" | = | Defendant's Response to PSOF | [DE 183] |
| "DSOF" | = | Defendant's Statement of Undisputed Material Facts | [DE 175] |
| "PR" | = | Plaintiffs' Response to PSOF | [DE 186] |

facts)). Plaintiffs have asserted some 60 material facts. (PSOF; DE 187). [2] These submissions pose dozens of disputes of fact, some material and some clearly not. I provide a broad background and highlight just a few of the material disputes that stand in the way of summary judgment for either side.

Scotts is a multi-national lawn and garden supply company headquartered in Marysville, Ohio. (DSOF, PR ¶ 40). Scotts sells its products to retailers throughout the United States. (DSOF, PR ¶ 44). Those retailer-customers range from large home centers, such as Lowe's, Home Depot, and Wal-Mart, to independent and local hardware stores, such as Ace Hardware. (Id.). Scotts' business development team negotiates and executes the sale of Scotts products to the various retailers. (Id.).

Scotts' field sales organization is divided into regions, which are divided into districts, which are further divided into territories. (PSOF, DR ¶ 12; see also DSOF, PR ¶ 45–48). Before 2016, there were five regions; in 2016–17 there were four. (DSOF, PR ¶¶ 46–47). Each district has its own District Market Manager ("DMM"). (DSOF, PR ¶¶ 48–49). Scotts currently has 27 districts in the United States. (DSOF, PR ¶ 50).

Each district is divided into from 8 to 12 territories. (DSOF, PR ¶¶ 51, 52) Each contains, e.g., Lowe's and Home Depot stores. (DSOF, PR ¶ 53).[3] The number of retail stores in each territory ranges from 7 to 26. (DSOF, PR ¶ 54).

In each territory are Sales Managers, a category that includes the plaintiffs to this action.[4] (DSOF, PR ¶ 57, 58; see also PSOF, DR ¶ 13). The

---

[2]  The parties are reminded that "purpose behind [the L. Civ. R. 56.1] statement is to clarify the issues for the Court, not to increase the burden before it." *Durkin v. Wabash Nat.*, Civ. No. 10-2013, 2013 WL 1314744, at *6 (D.N.J. Mar. 28, 2013) (Rodriguez, J.) (citing L. Civ. R. 56.1, Comment 2d.). To put it another way, the function of such a statement is to assist the court in drafting an opinion, not to awe the opposition.

[3]  Prior to 2016, the territories included Wal-Mart stores. (DSOF, PR ¶ 55).

[4]  An employee's "job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2. With that in mind, I

parties dispute whether the Sales Managers actually perform managerial functions within their assigned territories. (*See e.g., id.*). Each Sales Manager reports to a DMM. (DSOF, PR ¶ 68). Plaintiffs assert that Sales Managers spend the majority of their time doing merchandising work, which Scotts disputes. (PSOF, DR ¶ 17). The parties also dispute the amount of discretion granted to Sales Managers. (*See, e.g.,* PSOF, DR ¶¶ 23–27 (disputing Sales Managers' control over product placement in stores); PSOF, DR ¶ 21 (disputing whether Sales Managers choose merchandise or have management authority)).

M&Cs are the employees beneath Sales Managers. (DSOF, PR ¶ 59). M&Cs are responsible for merchandising Scotts' products in retail stores by placing them on designated shelves, building and constructing product displays, and maintaining, organizing, cleaning, and replenishing shelf space. (DSOF, PR ¶ 40). The parties dispute whether the M&Cs' responsibility for merchandising is shared with Sales Managers. (*Id.*).

Plaintiffs characterizes M&Cs as seasonal and part-time employees; Scotts asserts that some M&Cs work full-time. (PSOF, DR ¶ 2). The parties dispute whether M&Cs log most of their hours during a busy spring season. (PSOF, DR ¶ 3). It remains unclear how many how many M&Cs work for the company during and after the purported peak season. (PSOF, DR ¶ 3).

The parties dispute how much time Sales Managers spent supervising M&Cs. (DSOF, PR ¶ 59). Plaintiffs rely on spreadsheets allegedly containing the names and hours of every M&C who worked with each Plaintiff. (PSOF ¶ 6). Using the spreadsheets and payroll data provided by Scotts (*see* Lesser Decl. DE 181 ¶¶ 18–20), Plaintiffs have created a summary chart of the time Plaintiffs spent supervising two or more M&Cs. (*Id.*; Summary Chart, Ex. 16, DE 181-16; *see also* PSOF, DR ¶¶ 7–9). Plaintiffs' counsel, Seth R. Lesser, has provided a declaration in support of the summary chart, explaining it as follows:

---

note that the commonplace understanding of the title Sales Manager, *i.e.*, one who manages salespersons, does not seem to fit.

[The chart] [s]ummarize[es] Plaintiffs' review of the M&C hour and payroll data produced by the defendant . . . Plaintiffs studied the data across a full six-year period from 2011-2016. Plaintiff identified the total number of two-week pay periods worked by any of the Discovery Opt-ins (as well as the pre-notice plaintiffs), plus all the hours by any co-working M&C recorded during those same pay periods. Plaintiffs found that, on average across the full six years, the 25 SMs included in the review directed the work of two-or-more employees only 44% of the time (i.e., in only 44% of the over 2500 two-week pay periods that the SMs worked did the M&Cs under their direction collectively log 160 or more hours). As well, across the six years, no individual SM directed the work of two-or-more employees more than 65% of the time, and the majority of SMs directed the work of two-or-more other employees less than 50% of the time.

(DE 181 ¶ 20) (referring to Chart, Ex. 16, DE 181-16)).

Scotts takes issue with the Plaintiffs' use of the summary charts and Lesser Declaration. (*See e.g.*, PSOF, DR ¶¶ 7–9). In Section II.b.i.1.a, *infra,* I conclude that Plaintiffs may rely on summary charts. Nevertheless, the amount of time Plaintiff Sale Managers spent directing the work of two or more employees remains a disputed issue of fact. (PSOF, DR ¶¶8–9).

### b. Procedural history

I write for the parties and therefore assume familiarity with the procedural history, including my (DE 66, 120, 217) and Judge Dickson's (DE 107) previous opinions.

On December 20, 2013, Plaintiffs Depalma and Leszczynski, through their counsel, filed a "Class Action Complaint and Demand for a Jury Trial." (DE 1). On February 4, 2014, Depalma and Leszczynski filed their "First Amended Collective Action Complaint and Demand for Jury Trial." (DE 5).

In April 2014, after the retirement of Judge Cavanaugh, this case was reassigned to me. (DE 25). Although Magistrate Judge Hammer originally had the case, it was soon reassigned to Magistrate Judge Dickson. (DE 31).

On March 31, 2016, I granted Plaintiffs' motion for conditional certification. (DE 66, 67). About two weeks later, I approved the form of the

parties' proposed FLSA notice. (DE 70). By July 22, 2016, approximately 100 opt-ins had filed their consent forms. (*See* DE 72–106).[5]

On August 4, 2016, Judge Dickson granted Plaintiffs' equitable tolling motion and ordered that the statute of limitations for the collective action opt-ins to be tolled from March 20, 2015 to April 11, 2016. (DE 109). Scotts appealed (DE 110), and I affirmed Judge Dickson's order. (DE 120, 121).

On November 12, 2018, Plaintiffs filed the motions that are now before me. Scotts filed a motion for summary judgment as to all plaintiffs (DE 174); Plaintiffs filed their own motion for summary judgment. (DE 177).

## II.    Discussion

### a. Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

---

[5]     Several of the opt-ins have withdrawn (*see* DE 140–145), and several others have been dismissed from the case (*see* DE 156, 164, 171).

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). That "evidentiary burden" is discussed in the following section.

6

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

### b. Analysis

I am presented with both sides' motions for summary judgment on the issue of whether the plaintiffs to this action ("Sales Managers" or "SMs") were exempt employees under the FLSA. Plaintiffs move for summary judgment, arguing that neither the executive nor administrative exemption applies. (DE 177-1). Defendant moves for summary judgment, arguing that the administrative exemption applies. (DE 174-1 pp. 14–27). Defendant argues in the alternative that, even if no exemption applies, Plaintiffs' damages should be calculated under a fluctuating-work-week method. (*Id.* pp. 27–30).

### i. FLSA Exemptions

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013)). Generally, an employer must pay its employees at least a minimum hourly wage for work performed and must pay one and one-half times the employee's regular wage for hours worked in excess

of forty hours per week. 29 U.S.C. §§ 206, 207. Exempt from the coverage of FLSA, however, are white-collar salaried employees, meaning "any person employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). *See also* 29 C.F.R. § 541.3.[6]

FLSA exemptions are to be given a fair (as opposed to narrow) interpretation. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (quoting A. Scalia & B. Garner, Reading Law 363 (2012)). Employers bear the burden to prove that an employee qualifies for an FLSA exemption. *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 790–91 (3d Cir. 2016); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991).[7]

---

[6]    The regulations expand on the distinction between blue collar and white collar employees for purposes of this exemption:

> The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists.

29 C.F.R. § 541.3(a).

[7]    The Third Circuit long held that exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)). *See also e.g., Mazzarella*, 823 F.3d at 790–91 ("FLSA exemptions must be construed narrowly against the employer, and Defendants "bear[ ] the burden of proving 'plainly and unmistakably' that the drivers qualify for the MCA exemption.") (citing *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 250 (3d Cir.2005) ((citing *Friedrich v. U.S. Comput. Servs.*, 974 F.2d 409, 412 (3d Cir.1992)) (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991))).

*Encino,* however, clearly overturns that former narrow-construction approach. *Encino*, 138 S. Ct. at 1142; *see also id.* at 1147 n. 7 (Ginsburg, J., dissenting) (objecting that the majority had "unsettle[d] more than half a century of our precedent"). Thus, employers are no longer bound to prove that an exemption is "plainly and unmistakably" within the statute. *See Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 570 (6th Cir. 2018) (stating the employee's burden, but no longer including that the exemption must be demonstrated "plainly and unmistakably"); *see*

## 1. Executive exemption

Plaintiffs move for summary judgment on the executive exemption, arguing that Sales Managers did not "customarily and regularly" supervise two or more employees, as required by 29 C.F.R. § 541.100(a)(3). In opposition, Defendant counters that there is at least an issue of fact as to whether the Sales Managers are subject to the executive exemption, or in the alternative that they are subject to the combination exemption.

An employee qualified under the executive exemption is one

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). On these motions, subsection (a)(3) is the primary focus. Under (a)(3), an employee must "customarily and regularly" direct the work of two or more employees. "[C]ustomarily and regularly" refers to supervision that is more than "occasional" but may be less than "constant." 29 C.F.R. § 541.701. A customary and regular activity "includes work normally

---

also *Danny Flores, et al. v. City of San Gabriel, et al.*, No. LACV124884JGBJECGX, 2018 WL 8017788, at *3 (C.D. Cal. Nov. 5, 2018) (considering, on a post-*Encino* motion for reconsideration of a FLSA summary judgment ruling made pre-*Encino*, that "[t]he narrow construction doctrine was a demanding test, under which employers asserting exemptions bore the burden of showing that their claimed exemption was plainly and unmistakably within their terms and spirits"). *But see Carr v. Flowers Foods, Inc.*, No. CV 15-6391, 2019 WL 2027299, at *6 (E.D. Pa. May 7, 2019) (Stating, in a post-*Encino* exemption case, that "FLSA exemptions must be construed narrowly against the employer, and Defendants bear the burden of proving plainly and unmistakably that the drivers qualify for [an] exemption").

and recurrently performed every workweek; it does not include isolated or one-time tasks." *Id.*

### a. 29 C.F.R. § 541.100(a)(3)

The thrust of Plaintiffs' argument against the executive exemption is that the Sales Managers supervised the M&Cs for an inadequate amount of time to satisfy 29 C.F.R. § 541.100(a)(3). In support, Plaintiffs cite depositions and the declaration and summary chart submitted by Plaintiff's Counsel, Seth R. Lesser. (DE 177-1 pp. 7–11). The summary chart is purportedly based on data provided by Defendant in discovery. (DE 196, p. 4, n. 3, p. 6). In particular, Plaintiffs point to spreadsheets identifying the hours worked by M&Cs who worked concurrently with the Plaintiffs. (*See* DE 181-14, 181-15).[8]

Defendant argues that Plaintiffs' reliance on their counsel's declaration and summary chart is contrary to Federal Rule of Civil Procedure 56(c)(4), Local Civil Rule 7.2(a), and Federal Rule of Evidence 701(c). (DE 182 pp. 7–10). Fed. R. Civ. P. 56(c)(4) requires that declaration submitted in relation to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Loc. Civ. R. 7.2(a), too, requires personal knowledge, and states that any legal arguments or summations included in a declaration "will be disregarded by the court and may subject the signatory to the appropriate censure, sanctions or both." In addition, Fed. R. Evid. 701(a) states that, if a witness is not an expert, opinion testimony must be "rationally based on the perceptions of the witness." Fed. R. Evid. 701(c) provides a distinction between lay and expert testimony: "While expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field,' 701(c) demands that lay testimony be grounded on 'process[es] of reasoning familiar in everyday life.'" *Acosta v. Cent. Laundry, Inc.*, 273 F. Supp. 3d 553, 557 (E.D. Pa. 2017) (citing Notes to 2000 Amendments).

---

[8]    Because they are voluminous, Exhibits 14 and 15 were provided to the Court on a flash drive.

Plaintiffs respond that the summary chart is allowed under Fed. R. Evid. 1006 because it summarizes the information contained in the voluminous but independently admissible Exhibits 14 and 15. At the court's discretion, *see Hutchins v. United Parcel Serv., Inc.*, 197 F. App'x 152, 59 (3d Cir. 2006) (citing Fed. R. Evid. 1006; *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 300–301 (3d Cir.1961)), a proponent may

> use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

Here, I agree with Plaintiffs. It is true that some courts have exercised their discretion to exclude summary charts under, for example, Loc. Civ. R. 7.2(a), but I am not bound to do so. *See Hutchins*, 197 F. App'x at 158–59. The reasons for offering a summary are manifest. Exhibits 14 and 15 contain data so voluminous that it was impractical even to file it electronically on the docket. (*See* DE 181-14, 181-15 (spreadsheets range anywhere from 200 to 174,000 lines long).)

The proponent, counsel for the plaintiffs, has gained personal familiarity with the underlying data furnished by Scotts; the underlying data would be admissible in evidence; and the calculations, which involve little more than arithmetic, are within the ken of a lay person. *See* Fed. R. Civ. P. 56(c)(4). (*See also* Ex. 16, DE 181-16 (reflecting simple percentage calculations of the time that an opt-in plaintiff managed 2 or more M&Cs)). As required by Fed. R. Evid. 1006, the underlying data are available to—indeed, were produced by—the defendant. As contemplated by that Rule, the defendant may of course challenge any perceived inaccuracies. If the summary remains the subject of disagreement, it might be the subject of conflicting testimony, perhaps even expert testimony, at trial. The background principle remains that the underlying data in Exhibits 14 and 15 could be placed in evidence. (I set aside

11

the question of whether that would be an effective trial tactic.) The indicia of admissibility, and the fact that the chart summarizes defendant's own data, persuade me that I may consider the chart, at least on summary judgment for the purpose of determining whether there is a triable issue of fact.[9]

This is Scotts' own information. Exhibits 14 and 15 are before the Court, and a defendant cannot defeat summary judgment by stating that its own documents are too voluminous or complex for the court to consider. For purposes of this summary judgment motion, I will consider the summary chart.

That is not to say, however, that the chart disposes of the issues. There are several disputes regarding the underlying data and analysis in the summary chart. (*Compare* DE 181 ¶ 20 (citing Ex. 16, DE 181-16), *with* Nickerson Decl., DE 182-1.) Under Evidence Rule 1006, Scotts is entitled to raise such objections. These disputes in themselves are significant enough to give rise to issues of material fact that preclude summary judgment.

Defendant argues with some force that the "summary chart" is based on incomplete data and that its analysis is flawed. First, Defendant's expert

---

[9]    The essential task on a Rule 56 motion is to determine whether the parties possess evidence that could be presented to a jury and that would create a triable issue. Thus there is an analogy to the presentation of relevant hearsay statements in summary judgment affidavits. On summary judgment, courts may consider such statements where it appears that there will be a foundation for their admission:

> The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only 'explain the admissible form that is anticipated.'" Thus, in ruling on Defendants' motion for summary judgment, the district court should have limited its inquiry to determining if the out-of-court statements Plaintiffs were relying on were admissible at trial.

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016) (internal citations omitted) (holding that out-of-court statements that plaintiffs relied on were admissible at trial when "[p]laintiffs identified the out-of-court declarants . . . and noted their availability to testify"); *see also* Fed. R. Civ. P. 56 (advisory committee notes to 2010 edition) ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

disputes some of Mr. Lesser's calculations. (See DE 182 p. 9 (citing Nickerson Decl., DE 182-1)). Second, Defendant argues that the summary chart uses incomplete or improperly formatted data. Specifically, Defendant says (1) the chart is missing a plaintiff, Mr. Jonathan Bridges; (2) the chart arbitrarily focuses on a 2-week pay period rather than individual work weeks; and (3) the chart does not consider data dating from after 2016. (DE 182 p. 10). Plaintiffs retort that the chart is relevant and that Defendants' criticisms do not imply that it cannot be considered. (DE 196 pp. 6–7).

The parties' dispute over the contents and significance of the summary chart, directly implicates the key issue of how many hours the Plaintiffs spent supervising M&Cs. I will therefore deny both sides' motions for summary judgment on the issue of the executive exemption.

### b. Special Master

Plaintiffs suggest a meritorious alternative to a battle of experts before a jury. They request that the Court appoint a special master to review the time records. *See Perez v. RadioShack Corp.*, 386 F. Supp. 2d 979, 993 (N.D. Ill. 2005) (considering the appointment a special master to review time records to identify affected class members).

I will direct that within seven days, counsel for the parties shall set up a conference by telephone or in person with Magistrate Judge Dickson. The object of the conference is to set up the appointment of a special master to review the time records and to extract information from them concerning the hours that Sales Managers spent supervising M&Cs in the relevant period. The parties may propose additional areas of review in which the assistance of a special master might be of use. In the conference, counsel may suggest candidates for this appointment and propose procedures, but the Magistrate Judge will have the authority to make the appointment and decide such matters as the scope of the special master's mandate and the allocation of costs.

I will add the following comment. This case has been pending for far too long. Referral to the Special Master is not an invitation to obstructionism, and I

will consult with the Special Master periodically to ensure that the parties are striving in good faith to clarify, not obscure, the issues. If this case must be tried, then so be it; the parties will be expected to render it trial-ready with dispatch and efficiency.

## 2. Combination Exemption

In the alternative, Plaintiffs invoke the "combination exemption."

The applicable regulation, 29 C.F.R. § 541.100(a)(2), sets forth the "primary duty" requirement of the executive exemption. However, even if an employee does not satisfy the executive exemption's primary duty requirement, the employee may qualify for a so-called "combination" exemption. 29 C.F.R. § 541.708 ("[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption."). That means that if an employee satisfies (a)(1), (a)(3) and (a)(4), but not (a)(2), the employee may still qualify as exempt, if that employee satisfies the combination primary-duty test. *See IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 295 (4th Cir. 2007) (holding that § 541.708 creates an alternative method for satisfying the primary duty test).

As discussed *supra*, the applicability of 29 C.F.R. § 541.100(a)(3) remains in dispute. I therefore will not reach the issue of the combination exemption at this time.

## 3. Administrative exemption

Plaintiffs and Scotts have both moved for summary judgment on the administrative exemption from FLSA coverage, which is distinct from the executive exemption. Issues of fact also preclude summary judgment on the issue of whether these Sales Managers fall under the administrative exemption.

The administrative exemption applies to an employee:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .

14

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

While the parties' submissions cover a range of issues,[10] I here highlight a dispute of material fact regarding subsection (a)(2). Section 541.200(a)(2) requires that an exempt employee's "primary duty" be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."

I first look to the regulations for further insight on § 541.200(a)(2). In order for an employee's duties to be "directly related to the management or general business operations," the employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. 541.201(a).

An employee's "primary duty" is the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700 (a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* Factors to consider include, but are not limited to

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

---

[10]     *See, e.g.,* DE 184 pp. 25 – 28 (arguing that a Sales Manager's primary duty does not involve discretion and independent judgment with respect to matters of significance, as required under § 541.200(a)(3)).

29 C.F.R. § 541.700 (a). While time spent performing exempt work is a "useful guide," it is not the "sole test" of primary duty. 29 C.F.R. § 541.700 (b). Even so, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* On the other hand, "if other factors support" that an employee meets the primary duty requirement, then it is not necessary that the employee spends more than 50 percent of her time performing exempt duties. *Id. See also Itterly v. Family Dollar Stores, Inc.*, 606 F. App'x 643, 646 (3d Cir. 2015) (recognizing "that an employee need not spend the majority of his time performing managerial tasks in order to be considered exempt."). Accordingly, courts apply a qualitative standard, looking to "the relative importance of the [exempt] duties as compared with the employee's nonexempt duties," and "whether the [exempt] activities are critical to the successful operation of the enterprise." *Itterly v. Family Dollar Stores, Inc.*, 606 F. App'x 643, 646 (3d Cir. 2015).

Defendants assert that the Sales Managers' primary duty was managing their territory (*see* DE 174-1 p. 19; DE 182 p. 19); Plaintiffs respond that their primary duty was merchandising (DE 177-1 pp. 20–21; DE 184 pp. 15–16). Plaintiffs state that they performed merchandising work a majority of the time, and cite the testimony of certain plaintiffs that they spent 80%–90% of their time on merchandising. (PSOF ¶ 17). Defendants dispute these facts and also argue that they are not material to the Plaintiffs' primary duties. (DR ¶ 17).[11]

---

[11]    Plaintiffs' ¶ 17 briefly cites the depositions of 17 plaintiffs who each estimate the percentage of their time spent on merchandising. Scotts' response to this paragraph—15 pages long— leads off with an "objection" that Plaintiffs' counsel improperly elicited this testimony on cross-examination in an attempt to "undermine" Scotts' direct examination. It then quotes the same deponents, highlighting that they were asked how much of "your" time was spent merchandising. Such answers, Scotts points out, do not establish that *others* who did not testify had a similar workload.

   Getting to the point, Scotts then cites contrary testimony to the effect that that merchandising was not the primary duty of SMS: the declarations of Plaintiffs' supervising DMMs, the prior declarations of some of the Plaintiffs, a string of purportedly time-intensive, exempt activities that Plaintiffs testified to performing, Plaintiffs' annual performance evaluations, the job description of the Sales Manager role, Plaintiffs' resumes and LinkedIn profiles, and Plaintiffs' e-mails. (*Id.*). In addition,

To be sure, time spent on exempt work is not the "sole test" of a primary activity, but it is surely probative. The primary duty test looks at the character of the employees' job as a whole. The time spent on a particular activity, whether exempt or non-exempt, is a useful tool in weighing that activity's importance in the balance. I therefore decline to award either side summary judgment when there is a live factual dispute as to how much time the Plaintiffs spent merchandising.

### ii. Damages

Scotts argues that if its motion on the administrative exemption is denied, the Court should rule that damages should be calculated using the fluctuating-work-week method ("FWW method"). (DE 174-1. pp. 27–30). In opposition, Plaintiffs argue that the FWW method is inapplicable to exemption misclassification cases, and, even if it is applicable, it is inappropriate given the facts of this case. The damages issues need not be considered unless liability is established. Still, because the liability case is necessarily structured in relation to what is recoverable, guidance on damages should be of assistance to the parties. I therefore treat this portion of Scotts' motion as being in the nature of a motion *in limine,* and grant it on that limited and provisional basis.

Under the FLSA, employees who have agreed to work at a fixed weekly salary, but whose hours vary week-to-week, are "assumed to have been paid for all hours worked at their regular rate of pay, with excess overtime due for hours worked over forty at one-half the regular rate of pay." *Banford v. Entergy Nuclear Operations, Inc.,* 649 F. App'x 89, 90 (2d Cir. 2016). The Supreme Court first upheld the use of the FWW method, albeit not in a misapplication case, in *Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572 (1942), holding:

> No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to

Scotts asserts that, even while merchandising products, Plaintiffs are still in charge of their work. (*Id.*). This surely suffices to create an issue of fact.

similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour. This is not an argument, however, against this method of determining the regular rate of employment for the week in question. Apart from the Act if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour.

*Missel*, 316 U.S. at 580 (internal quotations, footnotes omitted).

In 1968, the Department of Labor enshrined the FWW method in an interpretive rule, 29 C.F.R. § 778.114. Under the rule, payment may be remitted under the FWW method when: (1) "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period"; (2) the salary the employee receives is no less than minimum wage "for every hour worked in those workweeks in which the number of hours he works is greatest"; and (3) the employee "receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay." 29 C.F.R. § 778.114(a).

Every Circuit that has directly addressed the issue has determined that the FWW method applies to exemption misclassification cases, some relying on the implications of *Missel*, and others relying on § 778.114. *See e.g., Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (relying on *Missel*); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665 (7th Cir. 2010) (relying on *Missel*); *Clements v. Serco, Inc.*, 530 F.3d 1224 (10th Cir. 2008) (relying on § 778.114); *Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999) (relying on § 778.114).[12]

---

[12] Some courts applying § 778.114 hold that the parties must have had a "clear mutual understanding" that a salary covers both fluctuating hours and payment of

In *Urnikis-Negro*, the Seventh Circuit distinguished between *Missel*, on which it relied, and Section 778.114(a), which it held "does not provide the authority to apply the FWW method in a misclassification case." 616 F.3d at 666. While Section 778.114(a) provides a way for an employer to compensate a nonexempt employee for fluctuating hours, it "looks forward rather than backward," *id.* at 678, and "it is not a remedial measure that specifies how damages are to be calculated when a court finds that an employer has breached its statutory obligations." *Id.* Moreover, the court held, because the rule was not issued pursuant to the usual notice and rulemaking procedures, it is not owed full *Chevron* deference, although, it is still entitled to a "measure of respect" from the judiciary. *Id.* at 675–676. Finally, Section 778.114 requires that the parties mutually understand that the employee is paid for overtime work, which is an impossible agreement to reach if the employer believes the employee to be nonexempt and therefore not subject to overtime. *Id.* at 681. Thus, the Seventh Circuit held, instead of Section 778.114(a), the authority to calculate damages stems from *Missel*. *Id.* at 681–682. Other courts, however, have found Section 778.114 applicable. *See e.g., Valerio v. Putnam Assocs. Inc.*, 173 F.3d at 40.

What that means in practical terms is this: Under the FWW method, the employee's hourly rate for a given week will be calculated by dividing the fixed weekly salary by the number of hours worked. *Urnikis-Negro*, 616 F.3d at 681 (citing *Missel*, 316 U.S. at 579–580). That calculated hourly rate is considered to be the agreed-upon amount for that week, so long as the calculation does not yield a rate that is lower than the minimum wage. *Id.* at 680. For hours in

---

overtime. Thus, if § 778.114 applies, a misclassification case, by its very nature, cannot involve an employer which understood that employees were paid for overtime. *See Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, 203–05 (D. Conn. 2013).

Case law within the Second Circuit is split on this issue. *See Banford v. Entergy Nuclear Operations, Inc.*, 649 F. App'x 89, 90 (2d Cir. 2016) (*comparing Costello v. Home Depot, supra* (rejecting application of FWW method), *with Klein v. Torrey Point Grp.*, LLC, 979 F. Supp. 2d 417, 434–39 (S.D.N.Y. 2013) (finding FWW applicable in misclassification cases based upon *Missel*)).

excess of (usually) 40, additional overtime will be paid at one-half of that calculated hourly rate.[13] A similar calculation would be performed under Section 778.114. *Id.*; *see also* 29 C.F.R. § 778.114(a).

Following *Missel*, "employees and employers are free to agree to a reduced hourly wage in exchange for a fixed weekly salary, provided the fixed weekly salary covers all hours worked and meets minimum wage requirements." *Desmond*, 630 F.3d 351, 357 (4th Cir. 2011) (citing *Missel*, 316 U.S. at 580). Setting aside some complications, what *Missel* and section 778.114 essentially do is put a floor under the resulting wage. There is no fixed limit on the number of hours to be worked, but the fixed salary cannot result in a calculated hourly rate that is lower than the hourly minimum wage. It follows that the additional 50% premium for overtime hours cannot come out to less than half the hourly minimum wage. If the weekly salary divided by the number of hours worked comes out to a figure higher than the hourly

---

[13]    Notably, the approach taken by the Court in *Missel* treats the fixed weekly wage paid to the employee as compensation at the regular rate for all hours that the employee works in a week, including overtime hours. The employer will separately owe the employee a premium for the overtime hours, but because he has already been compensated at the regular rate for the overtime hours by means of the fixed wage, the employer will owe him only one-half of the regular rate for those hours rather than time plus one-half.

*Urnikis-Negro*, 616 F.3d at 675.

Assume, for simplicity, that minimum wage is $10 per hour, and that an employee has agreed to a weekly salary of $700 for whatever hours are worked.

If the employee worked 35 hours in a particular week, the salary would be $700 and the calculated hourly rate would be 700/35, or $20 per hour.

If the employee worked 50 hours, the calculated hourly rate would be 700/50, or $14 per hour. The agreed-upon base salary would still be $700 per week. For the 10 hours worked in excess of 40, however, the employee would be entitled to an overtime premium at a rate of half of $14, *i.e.,* $7 per hour.

If the employee worked 80 hours in a particular week, the calculated hourly rate would be 700/80, or $8.75—less than my hypothetical minimum wage, and therefore below the salary floor set by § 778.114(a) (requiring that the salary the employee receives is no less than minimum wage "for every hour worked in those workweeks in which the number of hours he works is greatest").

minimum wage, then both the regular and overtime rate will be correspondingly higher.

Our Circuit, the Third, has not yet decided the issue. Lacking binding authority, I am persuaded that the proper approach is that of *Urnikis-Negro*, 616 F.3d at 672–80 and *Desmond*, 630 F.3d at 356–357. I hold that the Court may apply the FWW method to calculate damages in an exemption misclassification case. However, the FWW method applies only if the parties had a "mutual understanding that the fixed weekly salary was compensation for all hours worked each workweek and the salary provided compensation at a rate not less than the minimum wage for every hour worked." *Desmond*, 630 F.3d at 354.

Plaintiffs argue that issues of fact preclude summary judgment in Scotts' favor because they and Scotts did not have the necessary "clear mutual understanding . . . that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number." 29 C.F.R. § 778.114. (The Plaintiffs make their argument based on the language of Section 778.114, but the argument under *Missel* would be the same. *See supra.*) That requirement flows from the recognition that employees *may* bargain away a fixed per-hour rate in return for the security of a fixed weekly salary, but will not be *presumed* to have done so. *See Desmond*, 630 F.3d at 357 (citing *Missel*).

Scotts has brought forth evidence that, at least for some Plaintiffs, there was the necessary "clear mutual understanding." (*See* DSOF ¶ 731 (stating that certain Plaintiffs testified that they understood their weekly salary would compensate them for all hours worked in a week, regardless of how few or how many)).[14] Plaintiffs respond that when they were hired, Scotts did not tell them "they would have to work overtime for as many hours as they did." (*Id.* (citing

---

[14]     Scotts' former objection that evidence regarding some plaintiffs does not necessarily apply to all plaintiffs (*see* pp. 16–17 & n.11, *supra*) is not manifest here.

PSDMF ¶ 34)). Further, Plaintiffs assert that they routinely complained that their pay was not fair in relation to the hours worked. (*Id.* (citing PSDMF ¶ 35)).

I think the Plaintiffs misidentify the issue. The issue is not whether they knew in advance the number of hours they would work each week. The necessary "mutual understanding" or "agreement" concerns whether their weekly salary would represent their compensation irrespective of the number of hours worked in any particular week (with additional compensation for overtime hours)—as opposed to, say, a fixed rate per-hour rate to be multiplied by the number of hours actually worked. In some instances, Plaintiffs' responding statement of facts also fails to cite to the record. (*See* PR ¶ 731 (stating, without citation, that the Plaintiffs understood they were salaried employees, but "they did not agree or anticipate that the SM position would routinely require them to work more than 60 hours a week")).

I therefore rule *in limine,* subject to proofs at trial establishing liability and the other prerequisites, that the FWW method is appropriate.

### III.  Conclusion

For the reasons set forth above, the motion (DE 177) for summary judgment of Plaintiffs on FLSA employee-exemption issues is DENIED, and the motion (DE 174) for summary judgment of Defendant Scotts on FLSA employee-exemption issues is also DENIED. Scotts' motion, insofar as it addresses the FWW methodology for damages, is treated as a motion *in limine* and on that limited basis is GRANTED.

An appropriate order follows.

Dated: June 10, 2019

**Kevin McNulty**
**United States District Judge**